Gerry W. MONROE, et al.,
Plaintiffs-Appellees-Cross-Appellants,
and

Equal Employment Opportunity
Commission, Intervening
Plaintiff-Appellee,

v.

UNITED AIR LINES, INC., and Air Line
Pilots Association International, De-
fendants-Appellants-Cross-Appellees.

Lee F. HIGMAN, et al.,
Plaintiffs-Appellees-Cross-Appellants,
and

Equal Employment Opportunity
Commission, Intervening
Plaintiff-Appellee,

v.

UNITED AIRLINES, INC., and Air Line
Pilots Association International, De-
fendants-Appellants-Cross-Appellees.

Eugene J. GORMAN, Plaintiff-Appellant,

v.

UNITED AIRLINES, INC.,
Defendant-Appellee.

Lee F. HIGMAN et al.
Plaintiffs-Appellants,

v.

UNITED AIRLINES, INC.,
Defendant-Appellee.

John W. BUOY,
Plaintiff-Appellee,

v.

UNITED AIR LINES, INC.,
Defendant-Appellant.

Nos. 83–1245, 83–1273, 83–1498, 83–1979,
83–2178, 83–2251, 83–2397, 83–2591, 83–
2646, 83–2252 to 83–2255, 83–2398, 83–
2758, 84–1099, 83–1305, 84–1448 and 84–
1476.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 6, 1984.

Decided May 30, 1984.

As Amended June 21, 1984.

As Amended on Denial of Rehearings
and Rehearings En Banc
Aug. 10, 1984.

Edward L. Foote, Winston & Strawn, Chicago, Ill., for defendants-appellants-cross-appellees.

Raymond C. Fay, Haley, Bader & Potts, Chicago, Ill., for plaintiffs-appellees-cross-appellants.

Barbara Lipsky, E.E.O.C.–O.G.C.–Appellate Div., Washington, D.C., George F. Galland, Jr., Davis, Miner, Barnhill & Galland, Chicago, Ill., for intervening plaintiff-appellee.

Before CUMMINGS, Chief Judge, and PELL and CUDAHY, Circuit Judges.

PELL, Circuit Judge.

These consolidated cases involve claims by 115 individual plaintiffs that defendant United Air Lines (United) violated the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621–634. The *Monroe* plaintiffs served as second officers on United's flight crews and challenged United's requirement that all second officers retire at age 60. The *Higman* plaintiffs served as captains and first officers and challenged United's refusal to allow them to transfer to second officer positions when they reached age 60, the age at which the Federal Aviation Administration (FAA) requires pilots to cease flying for commercial airlines. The cases were presented to a jury, which rejected United's claim that an under-sixty age requirement was a bona fide occupational qualification (BFOQ) for second officers and the claim that the refusal to allow the transfers was based on reasons other than age, in this case United's bona fide seniority system. Plaintiffs were permitted to elect reinstatement and were awarded actual damages and an equal

amount as liquidated damages when the jury found that United willfully violated the ADEA. *See* 29 U.S.C. § 626(b).

United raises a number of challenges to the district court's trial rulings and the post-trial relief ordered by the court. We will begin by examining the facts and arguments raised in United's principal claims: the court's instruction to the jury to evaluate United's defenses under an improper legal standard, and the court's error in not granting United's request for a judgment notwithstanding the verdict. Both parties presented extensive evidence on the disputed issues, and we will review only so much as is necessary to resolve the appeal.

## I Facts

United uses a three-person flight crew on certain jets. This crew consists of the captain, who is in command at all times, the first officer, who assists the captain in flying the aircraft, and the second officer or "flight engineer," who mans an instrument panel behind the pilots and monitors the various systems of the aircraft, such as the electrical and hydraulic. In the usual course of events a crew member begins his career at United as a second officer and progresses to first officer and then captain, although United does employ some career second officers.

It is not contended other than that the safe operation of aircraft depends both upon the crew's skill and physical condition. United spends a substantial amount of time and money ensuring that crew members are qualified on both counts. There was no dispute concerning the high quality of United's medical department or over the qualifications of Dr. Kidera during his 25 year tenure as head of that department. The medical department administered an annual physical examination of all flight crew members. This examination exceeded the requirements of the FAA. In addition, crew members must pass an FAA administered physical examination once a year to maintain their medical certificates.

The parties did dispute, however, United's ability to detect or predict physical deterioration in crew members over the age of 60. Both sides presented evidence, including expert testimony, on the effects of aging and the ability of medical science to separate the fit from the unfit after this age. The parties also presented conflicting testimony regarding the importance of screening out unfit second officers in ensuring the safe operation of the aircraft.

United's expert, Dr. Kidera, testified that United instituted a policy requiring all crew members to retire at age 60 in 1950. According to Dr. Kidera, this policy was based on concerns about the increase in unpredictable medical conditions after age 60. Since 1960, the FAA has required pilots of commercial aircraft to retire at age 60, *see* 14 C.F.R. § 121.383(c) (1983), because of similar concerns. Unlike United's rule, the FAA "age 60 rule" only applies to commercial carrier pilots and not to second officers on any type of aircraft or to pilots of other public craft. *See Gathercole v. Global Associates*, 560 F.Supp. 642 (N.D. Cal.1983) (FAA rule does not justify forced retirement of pilot of noncommercial aircraft). Nonetheless, United contends that the inability to detect physical deterioration in crew members over 60 justifies application of the age 60 rule to all crew members. Plaintiffs presented expert testimony that United could detect medical problems related to aging. Plaintiffs argued that United had been motivated to require retirement at age 60 for economic reasons, a decision that was legal in 1950, and was simply using the alleged safety concerns to justify the retirement policy in the face of ADEA proscriptions against age discrimination.

Both parties presented evidence concerning the importance of the second officer to the operation of the aircraft. The second officer controls various aspects of the craft's operations, but does not "fly" the plane in the ordinary sense of that word. Plaintiffs introduced evidence that operations performed by the second officer can be performed by other crew members in an emergency. In support of their claim that the second officer is not necessary to safety, plaintiffs introduced testimony concern-

ing United's policy of allowing pilots under 60 grounded by heart attacks and certain other illnesses to return to duty as second officers. This policy, which is not inconsistent with FAA regulations, was initiated after United studied the effects of second officer incapacitation on the returning pilots' ability to function in the cockpit. United admitted that it had such a policy, but indicated that the success rate of those return pilots had not been high.

United claimed that, regardless of the validity of the age 60 rule as applied to the *Monroe* plaintiffs, the *Higman* plaintiffs were denied transfers for a reason other than age; except in limited situations United does not allow pilots of any age to downgrade to second officers. This aspect of United's seniority system was designed, according to United, to ensure that second officer positions are filled by persons working toward positions as first officers and captains. To allow pilots of any age who can no longer serve as first officers or captains, and who will not be able to do so in the future, to fill second officer positions would hamper United's training of new pilots. The *Higman* plaintiffs, however, introduced evidence that younger pilots are permitted to downbid to second officer for a number of reasons.

## II The ADEA

The ADEA was enacted in 1967 in response to growing concern over unemployment among older workers and Congress' belief that much of the problem was attributable to "arbitrary discrimination in employment because of age." 29 U.S.C. § 621 (Congressional statement of findings and purpose). One step Congress took in dealing with age discrimination was to make it unlawful for an employer "to fail or refuse to hire or to discharge any individual ... because of such individual's age." 29 U.S.C. § 623(a)(1). The ADEA's protections extend to individuals between 40 and 70 years of age. 29 U.S.C. § 631(a).

Of particular importance to this case are those provisions that exempt certain employer actions from the coverage of the

Act. Section 623(f)(1) makes it legal to take action otherwise prohibited by the ADEA "where age is a bona fide occupational qualification reasonably necessary to the normal operation of the particular business, or where the differentiation is based on reasonable factors other than age." When enacted ADEA also allowed an employer "to observe the terms of a bona fide seniority system or any bona fide employee benefit plan ... which is not a subterfuge to evade the purposes of this chapter, except that no such employee plan shall excuse the failure to hire any individual." 28 U.S.C. § 623(f)(2). Congress became concerned as courts read (f)(2) to allow mandatory retirement based on age under pension plans and amended that section in 1978. S.Rep. No. 493, 95th Cong., 2d Sess., *reprinted in* 1978 U.S.Code Cong. & Ad. News 504, 513. As amended Section 623(f)(2) provides that "no such seniority system or employee benefit plan shall require or permit the involuntary retirement of any individual specified by section 631(a) of this title because of the age of such individual." 29 U.S.C. § 623(f)(2) (Supp. II 1978). Prior to 1978 United legally required all crew members to retire at 60 pursuant to the company's pension plan. Plaintiffs challenge only the continuation of that policy after 1978.

## III Jury Instructions

United claims that the district court erroneously instructed the jury in several crucial respects. Although jury instructions generally are to be evaluated as a whole, *United States v. Xheka*, 704 F.2d 974, 987 (7th Cir.1983), *cert. denied,* — U.S. —, 104 S.Ct. 486, 78 L.Ed.2d 682, in the context of this case we will examine the instructions relating to each issue separately. To the extent that one instruction relates to any other instruction, this will be considered in reaching a decision.

### A. Bona Fide Occupational Qualification

At trial United's principal claim in relation to both groups of plaintiffs was

that age was a bona fide occupational qualification reasonably necessary to the operation of their business, which is the safe transportation of passengers. United bore the burden of proving this affirmative defense. *Orzel v. City of Wauwatosa Fire Department,* 697 F.2d 743, 744, 753 (7th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 484, 78 L.Ed.2d 680. Prior to trial the leading BFOQ case from this court was *Hodgson v. Greyhound Lines, Inc.,* 499 F.2d 859 (7th Cir.1974), in which we held that Greyhound bus line was justified in refusing to hire drivers over 35 years old as age was a BFOQ in that context. The district court had entered judgment against Greyhound after finding that the company failed to prove that substantially all applicants over 35 years old would be unable to perform the job. We reversed, holding that it would be sufficient to establish a BFOQ for Greyhound to demonstrate "that it has a rational basis in fact to believe that elimination of its maximum hiring age will increase the likelihood of risk of harm to its passengers." *Id.* at 863. We ordered judgment entered for Greyhound as defendant had more than adequately demonstrated that it could not detect physical deterioration caused by aging and that the nature of the driving duties assigned to new drivers placed unusual physical demands upon the driver. Greyhound demonstrated that a driver normally progresses to easier routes as he gets older and that a driver hired over the age of 35 would not achieve the necessary seniority to attain the less demanding routes before his physical performance declined.

The *Greyhound* opinion did not articulate the employer's initial burden in establishing a BFOQ that the qualification must be "reasonably necessary" to the operation of the employer's business. In *Greyhound* there was no question but that a driver physically capable of operating the bus safely was necessary to the company's business. *Greyhound* did make clear that an employer could establish the second aspect of a BFOQ by demonstrating either that substantially all individuals over the qualifying age are unable to perform the job *or* that it is impractical to screen out those individuals over the age limit who will be unable to perform the required work.

■ This two-prong test, which requires first proof that the qualification is reasonably necessary and then that age is a bona fide means of determining whether an individual possesses that qualification, has been more clearly articulated in several post-*Greyhound* decisions. We dealt most recently with this test in *Orzel v. City of Wauwatosa Fire Department,* 697 F.2d 743 (7th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 484, 78 L.Ed.2d 680. In *Orzel* we read *Greyhound* as requiring that:

> [I]n order to prevail on a BFOQ defense, an employer must show that the challenged age qualification is reasonably related to the "essential operation" of its business, *and* must demonstrate *either* that there is a factual basis for believing that all or substantially all persons above the age limit would be unable to effectively perform the duties of the job, *or* that it is impossible or impracticable to determine job fitness on an individualized basis.

*Orzel,* 697 F.2d at 753 (emphasis in original). This explication of the elements of the BFOQ defense is consistent with those offered by other circuits. *See Tuohy v. Ford Motor Co.,* 675 F.2d 842 (6th Cir. 1982); *Smallwood v. United Air Lines, Inc.,* 661 F.2d 303, 307 (4th Cir.1981), *cert. denied,* 456 U.S. 1007, 102 S.Ct. 2299, 73 L.Ed.2d 1302 (1982); *Harriss v. Pan American World Airways, Inc.,* 649 F.2d 670 (9th Cir.1980); *Usery v. Tamiami Trail Tours, Inc.,* 531 F.2d 224 (5th Cir.1976).

United introduced evidence that a second officer who becomes incapacitated in flight endangers the safe operation of the plane and that it is impractical to determine which second officers over the age of 60 may become medically incapacitated on an individual basis. United did not claim that substantially all second officers over 60 are incapable of performing their jobs. The

district court instructed the jury to evaluate United's claim under the following standard:[1]

> If United shows, by a preponderance of the evidence, that age is a "bona fide occupational qualification" for the position of Second Officer for either of the reasons next discussed, then you are to find that United is not liable to any of the plaintiffs against whom the BFOQ defense is proved.

> \* \* \* \* \* \*

> [T]he first BFOQ question you must decide in this case is whether the essence of United's operations would be undermined by its not having a policy of prohibiting service by Second Officers after age 60. In that respect, you are to decide whether United has proved by a preponderance of the evidence that the duties and responsibilities of the Second Officer are reasonably necessary to the essence of United's business of transporting passengers safely from one point to another.

> Thus the threshold determination you must make on the BFOQ issue concerns the nature of the Second Officer job and its relationship to the essence of United's business.

> If you find that United had met its burden of proof that I have described earlier on that threshold question, then you are to go on to decide whether United has proved by a preponderance of the evidence that, at the time it retired each plaintiff, it had a reasonable basis in fact to believe that not having a policy prohibiting the employment of Second Officers 60 years of age or older would increase the likelihood of risk of harm to its passengers—that not having such a policy might jeopardize the life of one more person than might otherwise occur under its present age 60 policy. To do this, United must show that: (1) the basis for the belief is grounded in facts proved by United; and (2) its belief is rational, that is, one founded in good faith and reason.

> On the other hand, if you find that United has not met its threshold burden of proof that I have described earlier, you are to apply a different standard in deciding whether United has established a BFOQ defense. Under this standard, United must prove by a preponderance of the evidence that, as of the time it retired each plaintiff, it was impossible or highly impractical to deal with Second Officers on an individualized basis, in which event it may apply a general rule requiring all of them to retire at age 60 if you find such a rule reasonable.

 We agree with United that this instruction is erroneous[2] and requires reversal of the jury's verdict. United was entitled to judgment in its favor on the BFOQ issue if the jury found that the position of second officer is reasonably necessary to the safe operation of the aircraft and that it is impractical to screen out those second officers over the age of 60 who may become incapacitated or otherwise medically unable to perform their duties. The court's instruction, however, told the jury not to consider this second element unless it found that United had *not* met its burden as to the first element. While this error provided United with a chance of winning to which it was not entitled, it also denied United a method of establishing its case to which it was entitled.

 The instruction is not saved by the general language instructing the jury that United could establish its BFOQ defense by

---

1. The court's complete instruction included a short explanation of the *Greyhound* decision by way of illustration of the first prong of the BFOQ test. We do not regard the analogy as prejudicial to United.

2. Plaintiffs claim that United suggested this instruction in its pretrial brief and therefore may not challenge it now. To the extent that this is true, it is irrelevant. United made its objections known before the jury was instructed and it is not estopped by its pretrial brief. Furthermore, the proper evaluation of United's BFOQ defense affects not only the parties, but also the lives of countless passengers who travel by air. We are not willing to jeopardize the safety of air travelers because of a pretrial brief.

proving a good faith basis for believing that elimination of the age 60 rule might increase the risk of harm to passengers. While such language arguably encompasses United's claim that it cannot screen out those second officers over 60 who pose a risk to passenger safety, any chance that the jury understood the instruction in this manner is eliminated by the language defining United's screening-out argument as a "different standard" than that expressed by the more general "increase in risk" language. Whatever the jurors understood the "increase in risk" language to mean, they could not have understood it to mean that it was impractical to screen out unfit, older second officers.

On retrial the district court can reshape and clarify the BFOQ instruction by simply following the language in *Orzel.* As we shall discuss in greater detail in regard to the "pretext" instruction, the court should make clear that the existence of a BFOQ is determined by objective evidence concerning the role played by second officers and medical science's ability to detect and predict medical conditions in those over the age of 60, not by United's subjective beliefs or good faith. We turn now to consider United's remaining challenges to the other instructions as they are likely to resurface at a new trial.

### B. Age A Determining Factor

■ The court instructed the jury that the plaintiffs, to make out a case of age discrimination, must prove that "age was a determining factor" in United's retirement and transfer policies. In relevant part this instruction read:

> You need not find that age was the only reason. If more than one factor was involved, plaintiffs are still entitled to recover if one of the factors was their age and if age made a difference in United's decision, and if other factors discussed later in these instructions do not prevent such recovery. If you find that more than one factor affected the decision, and if one of these factor's was plaintiffs' age, and if it made a differ-

ence in determining whether they could work as Second Officers, then you must go on to consider the justifications asserted by United in the manner covered by other instructions.

United claims that because it admitted that age was the basis for the retirement policy, this instruction was tantamount to a directed verdict for plaintiffs. In making this argument United ignores the language directing the jury to consider United's defenses once age was found to be a determining factor. The instruction properly told the jury that plaintiffs must first prove age discrimination and that this required proof that age was a determining factor. *Cuddy v. Carmen,* 694 F.2d 853, 859 (D.C.Cir.1982); *Cancellier v. Federated Department Stores,* 672 F.2d 1312, 1316 (9th Cir.1982), *cert. denied,* 459 U.S. 859, 103 S.Ct. 131, 74 L.Ed.2d 113; *Meschino v. ITT,* 563 F.Supp. 1066 (S.D.N.Y.1983). While this instruction may not be necessary when a defendant admits that age was a determining factor in all of the disputed decisions, that is not the case here. United never admitted that age was a determining factor in its transfer policy. In fact United steadfastly maintained that the transfer policy was age-neutral. This, combined with the clear instruction that a finding that age was a determining factor was the beginning rather than the end of the jury's inquiry, undermines defendant's claim of error.

### C. Pretext

■ United challenges the "pretext" instruction given by the court. In the course of instructing the jury on how to evaluate plaintiffs' claims concerning the age 60 rule and United's transfer policy the court stated:

> Other instructions will deal with the several justifications asserted by United for its actions. Even apart from these instructions, plaintiffs may prevail if they show that these justifications were not the real reason for United's actions, but were a pretext for age discrimination. Plaintiffs may show pretext either

by showing that United's actions were a mask or cover-up for age discrimination, or by showing that the reasons stated in support of its several justifications are unworthy of being believed.

United complains that this instruction contradicts the BFOQ instruction, which requires United to prove that its belief that the age 60 rule is necessary is "founded in good faith and reason." We find no contradiction in instructing that United must prove good faith to establish a BFOQ while also instructing that plaintiffs will prevail if the jury finds that United did not act in good faith. In this respect the instructions are, at worst, redundant. There is some contradiction in assigning the burden of proving good faith to United and the burden of proving bad faith to plaintiffs, but this could not prejudice United if it properly bore the burden of proving its good faith. Nevertheless, we find this instruction erroneous for other reasons and hold that it should be modified upon retrial.

Since *McDonnell Douglas Corporation v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), a plaintiff's burden in proving any employment discrimination claim has been clear. A plaintiff must prove that he was discriminated against because of his membership in a protected group rather than because of lack of qualifications or other legitimate reasons. In *McDonnell Douglas* the Court held that a plaintiff may establish a prima facie case of discrimination by showing (i) that he belongs to a protected group; (ii) that he applied and was qualified for a job for which the employer was seeking applications; (iii) that he was not hired; and (iv) that the employer continued to seek applicants. If the plaintiff succeeds in establishing these elements, the employer must "articulate some legitimate, nondiscriminatory reason for the employee's rejection." *Id.* at 802, 93 S.Ct. at 1824. Should the employer articulate a nondiscriminatory reason, the plaintiff must demonstrate that the articulated reason was not the real reason for the employer's action, but was instead merely a pretext for discrimination.

The *McDonnell Douglas* method of proof is simply a commonsense method of proving that the plaintiff was discriminated against *because* of his membership in a protected group. Plaintiff, in essence, to establish a prima facie case must eliminate the most obvious legitimate reasons for the employer's actions—plaintiff's lack of qualification or the employer's lack of need—to establish that the employer was motivated by an illegitimate reason. This method of proving plaintiff's case in chief is available to those claiming age discrimination as well as any other type of discrimination. *Golomb v. Prudential Insurance Company of America,* 688 F.2d 547 (7th Cir.1982).

Pretext, as such, does not come into play in evaluating an affirmative defense. Rather, it is properly used only in establishing a claim of discrimination. An affirmative defense, such as the BFOQ claim, will not even be considered until the fact of discrimination has been established. A pretext instruction almost identical to that given here, in a case similar to this, was found to be error, albeit harmless, in *Criswell v. Western Airlines, Inc.,* 709 F.2d 544 (9th Cir.1983), in which the court noted that "[p]retext plays no role in the factfinder's analysis of a claimed affirmative defense." 709 F.2d at 554.

To the extent that the court's instruction here merely told the jury that it need not accept United's defenses if they were "unworthy of being believed," it simply restated the jury's duty to evaluate the evidence. However, to the extent that the instruction stated that the jury could find that United had established a BFOQ or an age neutral reason for not allowing transfers and still find for plaintiffs because United would have discriminated against plaintiffs regardless of the existence of these reasons, and therefore had "bad faith," the instruction was erroneous.

If United established that age below 60 was a BFOQ it was entitled to require plaintiffs' retirement regardless of any evidence that the company would have taken this action without any justification. Once the jury finds that second officers are necessary to the safe operation of the plane

and that it is not practical for United to screen out those second officers over 60 who cannot perform their jobs, then the safety of the passengers is of paramount importance and United's animus toward older workers becomes irrelevant. *See E.E.O.C. v. Texas Health Science Center,* 710 F.2d 1091, 1096 (5th Cir.1983) (BFOQ depends solely on objective test of whether age qualification is justified, employer's subjective motivation is irrelevant). Because United admits that age is the sole basis for its retirement policy there is no question of pretext on this issue and the jury should be instructed accordingly.[2a]

■ The analysis of United's claim that the no-transfer policy is based on their age-neutral seniority system is different. United claims that pilots are not allowed to transfer to second officer positions regardless of age. Plaintiffs, then, may establish that this reason is pretextual and that the transfer policy is in fact based on age. The jury, however, should be clearly instructed that any age-neutral transfer policy is a defense to a disparate treatment claim even if United has exhibited bad faith toward older workers. The employer's good or bad faith toward older workers is relevant to the question whether the transfer policy is age-neutral, but not to whether an age-neutral policy is justifiable.

■ Plaintiffs have also claimed that the no-transfer policy, even if age-neutral, is discriminatory as it has a disparate impact on older pilots. Disparate impact claims do not depend on proof of motive, *Criswell,* 709 F.2d at 554, and the jury should not consider the issue of pretext on this claim. Should United raise a business necessity defense to the disparate impact claim, the jury may consider whether the transfer policy is the least discriminatory method of achieving United's goals. *Criswell,* 709 F.2d at 554.[3]

## IV *Judgment Notwithstanding the Verdict*

United argues that there is no need for a new trial as the evidence establishes United's right to a judgment notwithstanding the verdict (JNOV). United presses this claim both as to its BFOQ defense and as to its seniority system. In both cases the standard for determining whether a JNOV should be granted is whether "the evidence presented, combined with all reasonable inferences drawn therefrom, is insufficient to support the verdict when viewed in the light most favorable to the party against whom the motion is directed." *Syvock v. Milwaukee Boiler Manufacturing Co.,* 665 F.2d 149, 153 (7th Cir.1981).

### A. BFOQ

■ To be entitled to a JNOV on the BFOQ defense United must establish that the evidence was insufficient to support either a finding that second officers are not necessary to safety or a finding that it is possible to screen out those second officers over age 60 who may become incapacitated in flight. We are not convinced that there was insufficient evidence on either count.

United presented evidence concerning the importance of second officers to the safe operation of the plane. This evidence included the fact that the FAA requires the use of second officers on certain jets and testimony from several of the plaintiffs concerning the general need for competent second officers. Several plaintiffs also testified to specific instances in which a second officer contributed to the safe operation of the plane. Other plaintiffs, on the other hand, produced evidence demonstrating that second officers are not reasonably necessary to safety. This included evidence that second officers do not fly the craft and that first officers and captains are fully capable of assuming the second

---

**2a.** In its petition for rehearing, the EEOC has suggested for the first time that if an age qualification were in fact necessary for public safety, but the employer acted in bad faith toward older workers in imposing the age qualification for discriminatory reasons, the employer should still be liable under the ADEA for back pay. The EEOC has also suggested that the protection of public safety in such a case would be relevant in deciding whether to reinstate the victims of the employer's bad faith age discrimination. Since this point has been raised too late, we will not consider it here, but our opinion should not be construed to preclude consideration of this argument at a proper time.

**3.** We do not agree with United's claim that the disparate impact instruction given by the court was "so complex and convoluted" as to be unintelligible to the jury. The court correctly instructed the jury to compare the impact of the policy upon plaintiffs with its impact on younger pilots. We also do not agree with United's unsupported claim that it is questionable whether a plaintiff may prove violation of the ADEA by showing disparate impact on older workers of a facially neutral policy. *See Criswell,* 709 F.2d at 552.

officer's duties in an emergency. In addition, neither United nor the FAA treats the second officer position as critical to safety. The FAA has long approved exemptions that allow pilots recovering from serious illnesses to return to work as second officers. United has taken advantage of this policy and employed pilots under age 60 recovering from heart attacks, severe head injuries, emotional problems, and alcoholism to return as second officers.

■ As we noted previously, to establish a BFOQ United bears the burden of proving that the age 60 rule is "reasonably necessary" to the safe transportation of passengers. 29 U.S.C. § 623(f)(1); *see also Harriss v. Pan American World Airways, Inc.*, 649 F.2d 670 (9th Cir.1980) (even when passenger safety is involved, qualification must be reasonably *necessary* and not just reasonably related to safety). To establish this United must prove that an incapacitated second officer would endanger the flight. Although we have no doubt that the position of second officer is related to safety, we cannot say that the evidence in this case compels a finding that an incapacitated second officer would endanger the flight.

■ United's principal contention at trial was that it is impossible to predict which second officers over the age of 60 will suffer an unanticipated medical problem in flight or will not be able to perform adequately because of physical deterioration due to aging. Before examining the evidence presented on this claim we need to address a preliminary issue, which is whether United's ability to detect medical problems is to be judged as of 1978 or as of the time of trial. United argues that it made the decision to continue the age 60 rule for safety reasons in 1978 and that the evidence should be limited to United's ability to deal with second officers on an individual basis at that time. Plaintiffs argue that United's current abilities are relevant in assessing the continued validity of the age 60 rule. We agree with plaintiffs that a once-valid BFOQ may lose its justification with advances in medical science.

That the age 60 rule may have been a BFOQ in 1978 does not place it beyond challenge now. United, however, is not liable for damages caused by the rule for the period, if any, during which it was a BFOQ. If the evidence demonstrates that the age 60 rule had validity in 1978 but lost it sometime after 1978 the jury should make a determination as to the date when United should have dropped the rule and assess damages accordingly.

■ Both parties presented evidence concerning United's ability to deal with second officers over the age of 60 on an individual basis. As United has never allowed crew members to fly past the age of 60 there was no direct evidence of United's success in screening this age group. United did present evidence from which this information could be extrapolated. United demonstrated that medical groundings increase with the age of the crew members and that 50% of these groundings are unanticipated. United's Dr. Harper testified about United's experience in allowing pilots recovering from heart disease to serve as second officers. Despite extensive physical examinations that indicated that the pilots could return to work, many of the returnees were subsequently grounded again because of serious, recurrent difficulties. Indeed, one of the pilots died while serving as a flight crew member. United also introduced into evidence the FAA's age 60 rule and the medical reasons for its inception.

Plaintiffs presented expert witnesses, Dr. Mohler and Dr. Cohen, who testified that conditions that could impair a flight engineer's ability to perform his job can be detected. Dr. Mohler testified that one can predict which persons will suffer heart attacks independent of age through analysis of age-neutral risk factors. Dr. Mohler also testified about recent advances in medical science's ability to detect heart problems. Dr. Cohen testified to similar advances in the ability to detect any decline in a person's cognitive function. Plaintiffs presented evidence that United uses these methods to screen pilots recovering from medical problems who wish to return to

work. Plaintiffs also detailed United efforts at returning rehabilitated alcoholics to work through extensive testing.

Plaintiffs' experts reviewed United's medical testimony and concluded that the statistics on medical groundings did not support the age 60 rule. In fact, the median age for groundings was between 48 and 49 years old. Plaintiffs also claimed that United's figures concerning "unanticipated" groundings were misleading as the medical condition had usually been detected during the annual physical examination but did not require that the crew member be grounded until a later time. The evidence also demonstrated that in-flight incapacitations were rare and did not vary greatly between age groups; in fact, the most frequent cause of incapacitation was gastroenteritis, which is not related to age. There was no evidence that older pilots were less safe than younger pilots.

While United has vociferously attacked plaintiffs' evidence on this issue, the fact remains that there was sufficient evidence to permit the jury to find that United had not established this element of the FBOQ defense. In *Criswell v. Western Airlines, Inc.*, 709 F.2d 544 (9th Cir.1983), the court found that similar evidence concerning an airline's ability to detect second officers over the age of 60 who are physically unfit for their duties was sufficient to support a jury verdict for the second officers. Similarly, in *Air Line Pilots Association v. Trans World Airlines, Inc.*, 713 F.2d 940 (2d Cir.1983), *cert. granted*, —— U.S. ——, 104 S.Ct. 1412, 79 L.Ed.2d 739 (1984), the court rejected the union's claim that TWA could lawfully refuse to employ second officers over the age of 60 as "the evidence is overwhelming that an Age 60 Rule is not reasonably necessary to insure safety standards." *Id.* at 949. This finding was reached on the basis of evidence no more compelling than that presented by plaintiffs here. In finding that United is not entitled to JNOV on this defense, we also take note that the FAA has consistently refused to expand its age 60 rule to include second officers and that the agency does not even apply the rule to pilots of the

agency's planes. *ALPA*, 713 F.2d at 950. United is entitled to present its BFOQ defense to a jury under the appropriate legal standard, but to no more. However, in rejecting United's claim that it is entitled to a JNOV on the BFOQ claim we do not intimate that United's evidence is insufficient to support a jury finding in its favor.

### B. Seniority System

█ United attempted to defend its refusal to consider transfer requests by pilots over the age of 60 under two provisions of Section 623 of the ADEA. Under Section 623(f)(1), United argued that the no-transfer policy was based on "reasonable factors other than age," and under Section 623(f)(2) United argued that it was lawfully observing "the terms of a bona fide seniority system ... which is not a subterfuge to avoid the purposes of this chapter." In a decision that we need not review, the district court refused to allow United to proceed with its (f)(2) defense. As United's "reasonable factors other than age" defense was simply that its seniority system did not allow downgrading by any pilots, this decision did not prevent United from presenting evidence concerning its seniority system and we may evaluate United's claim that it is entitled to a JNOV on this issue.

The *Higman* plaintiffs correctly claim that they are entitled to the same treatment as that accorded to younger first officers and captains who can no longer serve in those capacities. United does not claim that it may cut off seniority rights when a first officer or captain turns 60, *see ALPA*, 713 F.2d at 953, but claims that it does not allow any pilot to downgrade to second officer except in limited circumstances.

The seniority system spelled out in the collective bargaining agreement that governs United's relationship with flight crew members allowed crew members to change positions either through "bidding" or "bumping." Crew members could use their seniority status to bid for a new posi-

tion, but only for a position of higher rank than their current status or for a position on higher status equipment. First officers and captains could only move to second officer positions through bumping a current second officer out of his position. Bumping was allowed under the agreement when pilot positions are eliminated through reductions in force, when pilots become unable to serve as first officer or captain because of medical conditions, and whenever United approved of the transfer under a catch-all provision. As second officers are paid less than first officers and captains few pilots will seek to downbid to second officer status without some justification.

United argues that it only permits pilots to bump to second officer when the pilots are reasonably likely to serve as pilots again. This policy protects pilots who are temporarily unable to fly as first officers or captians, while ensuring that second officer positions are filled mainly by crew members training for advancement. While allowing downgrades during reductions in force clearly serves this purpose, plaintiffs claimed that the remaining two provisions were used by United to allow younger pilots to transfer to second officer even when the pilot could not regain a first officer or captain position.

Section 14–G of the agreement provides that:

> In the event a pilot cannot pass an FAA 1st Class physical examination, but can pass an FAA 2nd Class physical examination and reasonable medical judgment indicates that he may obtain an FAA 1st Class medical certificate in the future, the Company shall utilize the pilot in the highest position to which he elects to bid or bump and for which he is medically qualified to fly.

On its face, this provision comports with United's policy of only allowing bumping by those pilots who may return to their former positions. Plaintiffs, however, introduced evidence that United did not

strictly enforce the requirement that the pilot be able to regain a 1st Class medical certificate.

Section 8–P–2 of the agreement provides that United and the Air Lines Pilots Association may allow a pilot to bump to a lower position. United has allowed a large number of pilots to transfer to second officer positions under 8–P–2. Many of these pilots sought the downgrade for reasons unrelated to their flying abilities and could later return to their positions as first officers and captains, but some of the pilots transferred because of their inability to perform the functions of first officer or captain or because of health problems that would keep them from regaining a 1st Class medical certificate.

Plaintiffs' evidence is sufficient to support a finding that United administered the seniority system in a discriminatory manner. United is entitled to a new trial on this issue under a proper pretext instruction under which the jury will determine whether United has discriminated, but not whether United harbors any animus toward older pilots. If United does not allow younger pilots any greater freedom in downgrading than older pilots, then the jury may consider whether the seniority system has a disparate impact on older pilots and any business necessity defense United may raise.[4] United may not justify age discrimination by claiming that it can accommodate the number of younger pilots who wish to downgrade but not the larger number of older pilots. Discrimination cannot be justified because it is economically efficient. *Orzel v. City of Wauwatosa Fire Department*, 697 F.2d 743, 755 (7th Cir.1983), *cert. denied*, —— U.S. ——, 104 S.Ct. 484, 78 L.Ed.2d 680. In any event, JNOV was not appropriate on the record as it was developed here.

*V Trial Rulings, Post-Trial Relief and Other Matters*

United raises numerous complaints about the evidentiary rulings made during the

---

**4.** Plaintiffs presented both disparate treatment and disparate impact claims to the jury, and we cannot know which theory the jury accepted in finding for plaintiffs, nor can we rule on the disparate impact as a matter of law.

trial and the district court's actions in ordering post-trial relief to plaintiffs. Because the jury verdict for plaintiffs cannot stand, these issues need not be resolved. United also challenges the district court's grant of summary judgment in favor of three pilots who improperly opted into the suit. 565 F.Supp. 271. Judgment for these pilots, Buoy, Nichols, and McIver, must be reversed along with judgment for the other plaintiffs. These pilots may present their claims upon retrial.

## VI *Appeal of Gorman*

As a final matter, we deal with the appeal of plaintiff Gorman. Gorman, a career second officer, opted into the suit and received a favorable jury verdict along with the other plaintiffs. Gorman was the only plaintiff to turn 60 prior to the April 6, 1978, amendment to the ADEA. In its answer, United raised an affirmative defense that applied only to Gorman. United claimed that Gorman's retirement was required by the terms of the company's bona fide retirement plan. As we noted previously, prior to April 6, 1978, the ADEA permitted involuntary retirement pursuant to the terms of a bona fide retirement plan that was not a subterfuge to evade the ADEA.

■ The bona fide retirement plan defense is an affirmative defense that the employer bears the burden of proving. *Sexton v. Beatrice Foods Co.*, 630 F.2d 478 (7th Cir.1980). United was required to prove not only that Gorman in fact was retired prior to April 6, but also that the plan required his retirement and was a bona fide plan. In anticipation of United's evidence on these points Gorman prepared a proposed jury instruction, to which United successfully objected.

United produced no proof concerning Gorman's retirement or the bona fides of the plan. Whether this was a tactical decision based on concerns that emphasis of the retirement plan would undercut the safety claims in the eyes of the jury, or whether it was an oversight caused by defending a complex case against many plaintiffs, the resulting total lack of proof was the same. Gorman, on the other hand, introduced proof that United did not retire employees until accumulated sick time was used, and that he had enough accumulated sick time to place his retirement after April 6 had the company followed this policy. The district court, undeterred by United's derelictions, entered judgment notwithstanding the verdict against Gorman. The court held that, as a matter of law, Gorman was retired before April 6 and that Gorman was estopped from contesting that the date of his retirement was the only issue by his proposed jury instruction. We must evaluate United's right to a JNOV on this issue by the same demanding standard that we applied to United's other claims.

■ We fail to see how Gorman can be estopped from requiring that United prove all the elements of its defense by a proposed jury instruction. The instruction contained no factual admissions, only a theory of law. Counsel's statements concerning legal theories do not work an estoppel. *Glick v. White Motor Co.*, 458 F.2d 1287, 1291 (3d Cir.1972); *New Amsterdam Casualty Co. v. Waller*, 323 F.2d 20, 24 (4th Cir.1963). This is especially true when the legal principle is embodied in a proposed jury instruction that has been successfully challenged by the opposing party. In this situation the opponent can hardly claim that it relied on the instruction to its detriment, a requirement of estoppel. *Packard Bell Electronics Corp. v. Ets-Hokin*, 509 F.2d 634 (7th Cir.1975).

■ Significantly, United does not attempt to defend the court's estoppel analysis. Rather, United claims that the elements of its defense are proved by Gorman's deposition. We perceive two insurmountable obstacles to United's success on this claim; Gorman's deposition was not offered as evidence at trial, and Gorman's deposition does not prove that Gorman was required to retire prior to April 6 or that the plan was bona fide and not a subterfuge to evade the ADEA.

United bore the burden of proving its defense. United failed to introduce the necessary evidence during the trial and now claims that it may do so on appeal, citing for the first time during oral argument our decision in *Sundstrand Corp. v. Sun Chemical Corp.*, 553 F.2d 1033 (7th Cir.1977). *Sundstrand* does not support the proposition, unique on its face, that a party with the burden of proof may introduce the necessary evidence for the first time on appeal. In a footnote in *Sundstrand* we considered evidence introduced at trial as well as evidence made part of the record on appeal to reject a theory advanced for the first time on appeal. This is a far cry from relying solely on such nonevidence to enter a JNOV for a party asserting an affirmative defense. United did not support its claim that Gorman was retired prior to April 6, 1978, pursuant to a bona fide retirement plan and may not now rectify its inaction.

Finally, even if United was entitled to rely on Gorman's deposition, that document does not prove that the plan was bona fide, nor does it counter Gorman's evidence that the company had a policy of not removing employees from the payroll until accumulated sick time was used. United did not prove the elements of its defense, and the district court erred in granting a JNOV for United on this issue. The Gorman case, however, is remanded for retrial along with the cases of the other plaintiffs.

## CONCLUSION

We hold that the district court erroneously instructed the jury regarding United's BFOQ defense and the role of pretext in evaluating United's claims. United is entitled to a new trial. Circuit Rule 18 shall apply. Judgment for plaintiffs is REVERSED and the injunction granted is voided. The cases are REMANDED for further proceedings consistent with this opinion.