Gerard J. CARON, et al., Plaintiffs,

v.

SCOTT PAPER COMPANY and S.D. Warren Company, Defendants.

Civ. No. 93–65–P–C.

United States District Court,
D. Maine.

Sept. 27, 1993.

motions for oral argument and to submit a sup- plemental memorandum are Denied.

Daniel W. Bates, James B. Haddow, Petruccelli & Martin, Francis Jackson, Portland, ME, for plaintiffs.

William J. Kayatta, Jr., S. Mason Pratt, Pierce, Atwood, Scribner, Allen, Smith & Lancaster, Portland, ME, for defendants.

## MEMORANDUM OF DECISION AND ORDER DENYING DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

GENE CARTER, Chief Judge.

This is an action for age discrimination brought under the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. §§ 621 *et seq.*, and the Maine Human Rights Act ("MHRA"), 5 M.R.S.A. §§ 4551 *et seq.*, by former salaried employees of Scott Paper Company's S.D. Warren paper mill in Westbrook, Maine. The matter before the Court is Defendants' Motion for Partial Summary Judgment on Counts II and VII of Plaintiffs' Complaint. (Docket No. 18). Counts II and VII allege violations of the Maine Human Rights Act and the ADEA based on the "disparate impact" suffered by Plaintiffs.

### FACTS

In October of 1990, S.D. Warren Company decided to reduce the number of salaried employees at the Westbrook Mill. This decision was brought about, at least in part, by the Company's decision to sell the mill and its desire to make the mill more attractive to potential buyers. Affidavit of Gary A. Parafinczuk (Docket No. 22) ¶ 5. S.D. Warren determined that it should be possible to increase productivity by reducing by approximately 20% to 25% the number of salaried employees at the mill. Parafinczuk Affidavit (Docket No. 22) ¶¶ 4, 11.

S.D. Warren determined which employees would be let go based on individual employee evaluations. Parafinczuk Affidavit ¶ 12. The assessment process used to evaluate each employee was developed by the S.D. Warren Mill Leadership Team ("MLT"), which was made up of the heads of several departments, along with the mill manager. Parafinczuk Affidavit ¶ 7. First, each department head divided the jobs in his department—including those to be eliminated—into "job groups." Parafinczuk Affidavit ¶ 13. Each job group was composed of jobs that required the same or similar skills on the part of the employees performing those jobs. Parafinczuk Affidavit ¶ 13.

After these initial steps were taken, Plaintiffs were evaluated by a team of co-workers using six subjective factors and one objective factor.[1] Parafinczuk Affidavit ¶ 14-15. No

1. The subjective factors used by the evaluation teams were: job skills; leading change skills;

single person or group graded all employees. Parafinczuk Affidavit ¶ 20. A final rating was developed for each employee by members of the respective department's evaluation team. Parafinczuk Affidavit ¶ 15. Employees selected for termination were those with the lowest scores in their job group. Parafinczuk Affidavit ¶ 15.

Plaintiffs were all at least fifty years of age as of March 13, 1991, and they were discharged from their employment at the mill on that date. The downsizing process resulted in an overall rate of retention of 61.5% of employees aged fifty and older, and an overall rate of retention of 91.5% of employees under fifty. Affidavit of Rosemary Roberts submitted in support of Plaintiffs' Class Certification Memorandum (Docket No. 17) ¶ 4.

## DISCUSSION

A motion for summary judgment must be granted if "[T]he pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The Court of Appeals for the First Circuit has aptly articulated the legal standard to be applied in deciding motions for summary judgment:

> [T]he movant must adumbrate 'an absence of evidence to support the nonmoving party's case.' *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 [106 S.Ct. 2548, 2554, 91 L.Ed.2d 265] (1986). When that is accomplished, the burden shifts to the opponent to establish the existence of a fact issue which is both 'material,' in that it might affect the outcome of the litigation,

interpersonal skills; self-management; performance; and versatility. The only objective factor was length of service.

2. Count II alleges a violation of the Maine Human Rights Act, 5 M.R.S.A. §§ 4571–4572, and Count VII alleges a violation of the Age Discrimination in Employment Act, 29 U.S.C. § 623. There is no Maine case law on whether the "disparate impact" theory is available for age-based violations of the Maine Human Rights Act. Because Maine courts generally follow federal courts when construing antidiscrimination provisions, the result this Court determines for Count

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 [106 S.Ct. 2505, 2510, 91 L.Ed.2d 202] (1986); *Hahn v. Sargent*, 523 F.2d 461, 464 (1st Cir.1975), *cert. denied*, 425 U.S. 904 [96 S.Ct. 1495, 47 L.Ed.2d 754] (1976), and 'genuine,' in that a reasonable jury could, on the basis of the proffered proof, return a verdict for the opponent. *Anderson*, 477 U.S. at 248 [106 S.Ct. at 2510]; *Oliver v. Digital Equipment Corp.*, 846 F.2d 103, 105 (1st Cir.1988). It is settled that the nonmovant may not rest upon mere allegations, but must adduce specific, provable facts demonstrating that there is a triable issue. 'The evidence illustrating the factual controversy cannot be conjectural or problematic; it must have substance in the sense that it limns differing versions of the truth which a factfinder must resolve at an ensuing trial' *Mack v. Great Atlantic and Pacific Tea Co.*, 871 F.2d 179, 181 (1st Cir.1989). As the Supreme Court has said:

> [T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or significantly probative, summary judgment may be granted.

*Anderson*, 477 U.S. at 249–50 [106 S.Ct. at 2511].

*Brennan v. Hendrigan*, 888 F.2d 189, 191–92 (1st Cir.1989).

## I. DISPARATE IMPACT CLAIMS [2]

 Under the ADEA, it is unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or

VII will also apply to Count II. *See Wells v. Franklin Broadcasting Corp.*, 403 A.2d 771, 773 (Me.1979) (Noting that "[t]he federal courts have reached a similar conclusion in construing the analogous federal statute prohibiting discrimination in employment on the basis of age."); *Harris v. International Paper Co.*, 765 F.Supp. 1509, 1511 (D.Me.1991) ("The MHRA was intended by the Maine Legislature to be the state analogue to Title VII, and the judicial construction of federal antidiscrimination law has, as a result, long been adverted to by the Law Court as persuasive authority for the interpretation of the MHRA.").

privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). Plaintiffs proceed under two theories of age discrimination: "disparate treatment" and "disparate impact." The chief difference between the two theories of liability is that disparate treatment involves discriminatory intent, whereas intent need not be shown in a disparate impact case. The disparate impact mode of analysis permits a plaintiff to recover for "employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity." *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 325 n. 15, 97 S.Ct. 1843, 1853 n. 15, 52 L.Ed.2d 396 (1977); *see also Griggs v. Duke Power Co.,* 401 U.S. 424, 431, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971) (finding as violative those employment practices that are "fair in form, but discriminatory in operation"). Disparate impact claims assess the effects, rather than the intent, of the "practices, procedures, or tests neutral on their face." *Griggs,* 401 U.S. at 430, 91 S.Ct. at 853.

■ The disparate impact theory was developed under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"). *See Griggs,* 401 U.S. at 424, 91 S.Ct. at 849. The Supreme Court has acknowledged that "[t]here are important similarities between [Title VII and the ADEA], ... both in their aims—the elimination of discrimination in the workplace—and in their substantive provisions. In fact, the provisions of the ADEA were derived in haec verba from Title VII." *Lorillard, Division of Loew's Theaters, Inc. v. Pons,* 434 U.S. 575, 584, 98 S.Ct. 866, 872, 55 L.Ed.2d 40 (1978). Although there are differences in the statutes and in the nature of the discrimination they prohibit, their similarities have led courts interpreting the ADEA to often borrow and apply Title VII analysis.

Defendants argue that disparate impact claims are not cognizable under the ADEA. Memorandum in Support of Defendants' Motion for Partial Summary Judgment (Docket No. 19) at 2. The Court of Appeals for the

First Circuit has assumed, without analysis, that the ADEA, like Title VII, allows a plaintiff to challenge discrimination under disparate impact analysis. *Holt v. Gamewell Corp.,* 797 F.2d 36, 37 (1st Cir.1986).[3] Other circuit courts of appeals which have addressed the viability of disparate impact claims in ADEA cases have approved, either directly or in *dictum,* the applicability of disparate impact analysis in the ADEA setting. *See Geller v. Markham,* 635 F.2d 1027 (2d Cir.1980), *cert. denied,* 451 U.S. 945, 101 S.Ct. 2028, 68 L.Ed.2d 332 (1981); *Laugesen v. Anaconda Co.,* 510 F.2d 307, 315 (6th Cir.1975); *Monroe v. United Air Lines, Inc.,* 736 F.2d 394, 404 n. 3 (7th Cir.1984), *cert. denied,* 470 U.S. 1004, 105 S.Ct. 1356, 84 L.Ed.2d 378 (1985); *Leftwich v. Harris–Stowe State College,* 702 F.2d 686 (8th Cir. 1983); *Palmer v. United States,* 794 F.2d 534 (9th Cir.1986); *Heward v. Western Electric Co.,* 35 Fair Empl.Prac.Cas. (BNA) 807; 35 Empl.Prac.Dec. (CCH), 1984 WL 15666 (10th Cir.1984); *Allison v. Western Union Tel. Co.,* 680 F.2d 1318 (11th Cir.1982).

The Supreme Court has "never decided whether a disparate impact theory of liability is available under the ADEA." *Hazen Paper Co. v. Biggins,* —— U.S. ——, ——, 113 S.Ct. 1701, 1706, 123 L.Ed.2d 338, 346 (1993). Moreover, certain members of the Court have expressed reservations regarding the applicability of disparate impact analysis in cases brought under the ADEA. *See Id.,* at —— – ——, 113 S.Ct. at 1710, 123 L.Ed.2d at 351–52 (Kennedy, J., with whom Rehnquist, C.J., and Thomas, J., join concurring) (Writing separately to underscore that the majority opinion applies only to disparate treatment analysis. "[W]e have not yet addressed the question whether [a disparate impact] claim is cognizable under the ADEA, and there are substantial arguments that it is improper to carry over disparate impact analysis from Title VII to the ADEA."); *Markham v. Geller,* 451 U.S. 945, 101 S.Ct. 2028, 68 L.Ed.2d 332 (1981) (Rehnquist, J., dissenting from denial of *certiorari* ).

### A. Application of Disparate Impact in ADEA Cases

Defendants contend that the Supreme Court's rationale for adopting the disparate

---

**3.** In *Holt* both parties apparently assumed that

disparate impact theory applied to the ADEA.

impact theory in Title VII cases does not support its application in age discrimination cases. Memorandum in Support of Defendants' Motion for Partial Summary Judgment (Docket No. 19) at 4. Defendants assert that the rationale adopted by the Supreme Court in *Griggs* was that "if facially neutral factors operated to disadvantage racial minorities, it could be presumed that it was because past societal discrimination created a discriminatory status quo which the neutral factors were perpetuating." *See Griggs*, 401 U.S. at 429–30, 91 S.Ct. at 853. According to this theory, disparate impact applies under Title VII because the individuals in its protected categories have suffered historical discrimination, or prejudicial assumptions about immutable characteristics. Defendants conclude that disparate impact analysis is not available under the ADEA because older Americans have not faced such problems.

This argument for limiting the use of disparate impact analysis to certain types of discrimination is based on a misunderstanding of the development of the theory. Examination of the Supreme Court's early disparate impact cases shows that its reasoning was not based on past discrimination. For example, in *Griggs*, the plaintiff challenged the requirement of a high school education or of passing a standardized intelligence test as a condition of employment. The Court emphasized that Title VII, on its face, prohibited employment actions that adversely affected minority members. The reasons for the adverse effect were not deemed crucial because "Congress directed the thrust of the Act to the *consequences* of employment practices, not simply the motivation." *Id.*, at 432, 91 S.Ct. at 854. In other words, the differential impact, not the reasons for it, constituted the harm in the employment practice and the

violation of Title VII. Although the Court did discuss possible reasons for the differential impact, the *Griggs* Court neither stated nor implied that other minority groups had to prove similar causes in order to use disparate impact analysis.

Furthermore, the Court's use of disparate impact analysis in *Dothard v. Rawlinson*, 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977), supports this view. In *Dothard*, the plaintiff was rejected as an applicant for a position as a prison guard because she failed to meet the statutory minimum weight requirement. The statute also required that applicants be a minimum height. She brought a class action alleging denial of employment on the basis of her sex in violation of Title VII. Extending the disparate impact analysis to sex discrimination, the *Dothard* Court declared minimum height and weight requirements illegal because of their disparate impact on female applicants. In doing so, the Supreme Court never discussed past discrimination but simply concentrated on the adverse effects of the employment policy on members of a protected group. *Id.*, at 328–32, 97 S.Ct. at 852–54.[4]

### B. Statutory Language

The ADEA, in identical wording to Title VII, provides that "[i]t shall be unlawful for an employer ... to limit, segregate, or classify his employees in a way which would deprive or tend to deprive any individual of employment opportunities or otherwise *adversely affect* his status as an employee, because of such individual's age." 29 U.S.C. § 623(a)(2) (emphasis added). *Compare* 42 U.S.C. § 2000e et seq. with 29 U.S.C. §§ 621–634 (Title VII has the same language except that "race, color, sex or national origin" stand in the place of "age."). The

---

4. Defendants contend that the disparate impact theory "would restrict the employer's ability to use generally in hiring or retaining workers any reasonable factor (*e.g.,* experience using computers) if the factor turned out to bear any significant correlation to age, even in the absence of either intent to discriminate or past vestiges of discrimination." Memorandum in Support of Defendants' Motion for Partial Summary Judgment (Docket No. 19) at 5–6. This argument is unpersuasive. The ADEA allows the employer to defend against an age discrimination claim by

showing that the "differentiation is based on reasonable factors other than age" or that the individual was discharged for "good cause." 29 U.S.C. § 623(f). Neither of these exemptions are found in Title VII. *See* 42 U.S.C. § 2000e et seq. The inclusion of these exemptions suggests that Congress thought the ADEA, without exemptions, would prohibit all facially neutral policies with adverse effects on older workers. Congress consequently carved out exemptions to limit the statute's reach to unreasonable and unnecessary policies.

phrase "or otherwise adversely affect" implies that an employment practice may constitute illegal discrimination even if not intended or directed specifically at age. Thus, the phrase not only prohibits intentional age discrimination but also forbids any policy having a more harmful effect on older people than on their co-workers.

## C. Legislative History

Defendants argue that the legislative history of the ADEA reflects the drafters' intent to prohibit disparate treatment, but not the impact of facially neutral factors. Defendants Memorandum in Support of the Motion for Partial Summary Judgment (Docket No. 19) at 6. Relying on the Report of the Secretary of Labor for support, Defendants distinguish between "arbitrary age discrimination" and "employment practices which quite unintentionally lead to age limits"—two types of age discrimination apparently discussed by the Secretary of Labor in his report on age discrimination. *The Older American Worker; Age Discrimination in Employment,* Report of the Secretary of Labor to the Congress Under Section 715 of the Civil Rights Act of 1964 ("Secretary's Report"). According to Defendants, the Secretary sought to prohibit only "arbitrary age discrimination" and with respect to "employment practices which quite unintentionally lead to age limits" sought only the adoption of measures designed to help employers and employees deal with the problem. Defendants Memorandum in Support of the Motion for Partial Summary Judgment (Docket No. 19) at 6. Defendants suggest that the Secretary's recommendations regarding these two categories of discrimination are reflected in the declared purpose for enacting the ADEA.

It is ... the purpose of this chapter to promote employment of older persons based on their ability rather than age; to *prohibit* arbitrary age discrimination in employment; to *help* employers and workers find ways of meeting problems arising from the *impact* of age on employment.

29 U.S.C. § 621(b) (emphasis added).

After reviewing the Secretary's Report, the Court is unable to find any reference to the category of "employment practices which quite unintentionally lead to age limits." Furthermore, the Court does not understand the prohibitory clause of section 621(b) to be limited to intentional age discrimination and the final clause to be limited to unintentional age discrimination.

In sum, the Court finds Defendants' arguments unpersuasive. Both the language of the statute and the case law support the use of disparate impact theory under the ADEA. Although it is unclear what the Supreme Court will decide when it addresses this issue, this Court finds it likely that both that Court and the Court of Appeals for the First Circuit, when squarely confronted with the issue, will hold that an action based on disparate impact is available under the ADEA.

## II. ESTABLISHING A DISPARATE IMPACT CLAIM

■ In order to establish a *prima facie* case of disparate impact under the ADEA, the plaintiff must: 1) identify the specific employment practices or selection criteria being challenged; 2) show disparate impact on the basis of age; and 3) show that the practice in question has caused the exclusion of applicants for jobs or promotions because of their age. *See Wards Cove Packing Co. v. Atonio,* 490 U.S. 642, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989); *Rose v. Wells Fargo & Co.,* 902 F.2d 1417, 1424 (9th Cir.1990). The evidence must show statistical disparities which are sufficiently substantial to raise an inference of causation. *See Watson v. Ft. Worth Bank & Trust,* 487 U.S. 977, 994–95, 108 S.Ct. 2777, 2789, 101 L.Ed.2d 827 (1988).

■ Once a plaintiff establishes a *prima facie* case of disparate impact, the burden shifts to the defendant, who may either discredit the plaintiff's statistics or proffer competing statistics to show that no disparity exists. *Wards Cove,* 490 U.S. at 659–60, 109 S.Ct. at 2126. The employer may also produce evidence that its practices are based on legitimate business reasons, such as job-relatedness or business necessity. The plaintiff is then given an opportunity to show that the employer was using the requirement as a mere pretext for discrimination. For example, the plaintiff may show that other tests or

selection methods having less discriminatory effects would serve the employer's legitimate interest in competent performance of the job.[5]

### A. Challenged Practice

 Defendants contend that Plaintiffs did not identify the employment practice being challenged. Plaintiffs, however, identified the outwardly neutral practice as "the process of selection designed and implemented by the Defendants" to determine which employees would be discharged from the mill. Complaint (Docket No. 1A) ¶¶ 27, 42. Disparate impact analysis may be applied to challenge both objective and subjective employment practices or criteria. *Watson*, 487 U.S. at 989–90, 108 S.Ct. at 2786. In *Watson* the Supreme Court held an employer's facially neutral practice of committing employment decisions to the subjective discretion of supervisory employees was a specific employment practice properly subject to a disparate impact analysis. *Id.* The Court explained that "[i]f an employer's undisciplined system of subjective decisionmaking has precisely the same effects as a system pervaded by impermissible intentional discrimination, it is difficult to see why Title VII's proscription against discriminatory actions should not apply." *Id.* at 990–91, 108 S.Ct. at 2787. Selection systems, like S.D. Warren's, that combine both subjective and objective criteria are generally considered subjective in nature and are a proper subject for a disparate impact challenge. *Id.* at 989, 108 S.Ct. at 2786.

### B. Proof of Disparate Impact

Defendants attack Plaintiffs' statistics on several grounds. Specifically, Defendants contend that Plaintiffs' statistical evidence is flawed because selection decisions regarding thirty-nine different job groups have been lumped into one set of statistical data. The resulting error from such aggregation is asserted to be that the retention rates from numerous departments could create an apparent disparity in the total numbers which does not exist in any of the departments. *See* Affidavit of Herbert I. Weisberg (Docket No. 21) ¶ 3. This inquiry raises genuine issues of fact, *inter alia*, whether Plaintiffs' statistical data accurately describe the impact of Defendants' downsizing. Because there are genuine issues of material fact regarding the initial statistical analysis, the Court will deny Defendants Motion for Partial Summary Judgment on Counts II and VII.

Accordingly, it is *ORDERED* that Defendants' Motion for Partial Summary Judgment on Counts II and VII be, and it is hereby, *DENIED*.

---

5. Congress amended Title VII in 1991. Civil Rights Act of 1991, Pub.L. No. 102–166, 105 Stat. 1071 *et seq.* (1991). By way of the amendments, Congress set out, *inter alia*, to "codify the concepts of 'business necessity' and 'job related' enunciated by the Supreme Court in *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), and in other Supreme Court decisions [issued] prior to *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989)." Civil Rights Act of 1991, Pub.L. No. 102–166, 105 Stat. 1071 (1991). *Griggs* indicated that an employer bears the burden of "showing" its business necessity. That term was later interpreted to mean that an employer assumes the *burden of persuasion* on this point. *See Wards Cove*, 490 U.S. at 659–60, 109 S.Ct. at 2126. In the 1991 Act, Congress effectively overruled that portion of *Wards Cove* that lessened an employer's burden once plaintiffs articulate a *prima facie* case of disparate impact. Congress has now codified the higher *Griggs* burden—the burden of production and persuasion.

Defendants contend, however, that *Wards Cove* still controls on this issue in ADEA cases. Memorandum in Support of Defendants' Motion for Partial Summary Judgment at 10 n. 5. Because the Court finds that disputed issues of fact remain in Plaintiffs *prima facie* case, at this time it is unnecessary to reach the issue of the effect of the 1991 amendments to Title VII on ADEA claims.